617 So.2d 380 (1993)
The MIAMI HERALD PUBLISHING, and Travelers Insurance Company of Illinois, Appellants,
v.
Ralph HATCH and Charlotte Hatch, Appellees.
No. 92-2189.
District Court of Appeal of Florida, First District.
April 16, 1993.
*381 Jerold I. Budney, Miami, for the Miami Herald Pub. Co., William Robinson, Miami, for Travelers Ins. Co., for appellants.
Richard A. Sadow & Suzanne Gorowitz, of Sadow & Lynne, Miami, for appellees.
MICKLE, Judge.
The Employer ("Herald Publishing") and Carrier ("E/C") appealed an order of the Judge of Compensation Claims ("JCC") finding Herald Publishing is the statutory employer of the Claimants, Ralph and Charlotte Hatch, and awarding medical and workers' compensation benefits and taxable costs. We affirm. Section 440.10(1), Florida Statutes (1989 & 1991).
Whether an entity such as Herald Publishing meets the definition of "statutory employer" depends on a determination as to whether the entity has incurred a contractual obligation to a third party, a part of which obligation the entity has delegated or sublet to a subcontractor whose employee is injured. See Roberts v. Gator Freightways, Inc., 538 So.2d 55 (Fla. 1st DCA), approved, 550 So.2d 1117 (Fla. 1989); Motchkavitz v. L.C. Boggs Industries, Inc., 407 So.2d 910 (Fla. 1981); Jones v. Florida Power Corp., 72 So.2d 285 (Fla. 1954). The JCC based the finding of statutory employment on the obligations that arose from Herald Publishing's numerous contracts with its advertisers. The E/C and Claimants stipulated to the following: 1) The Miami Herald is a newspaper of general circulation distributed throughout the state by Herald Publishing, a division of Knight-Ridder, Inc., a Florida corporation. 2) As with most newspaper publishing companies, the operating revenue of Herald Publishing derives primarily from the sale of advertising. 3) Newspaper advertising currently accounts for 78% of consolidated newspaper revenues. 4) Total newspaper circulation, penetration of the market by the newspaper, and delivery of the newspaper and its related advertising products are significant to The Miami Herald's advertisers and the sale of ads. 5) Circulation and delivery of the newspaper is essential to the sale of advertising, and if a newspaper and the related advertisements are not delivered to the readers of The Miami Herald, then Herald Publishing will not have performed for the advertisers a service that the advertisers paid for and expected. 6) Herald Publishing sells and delivers copies of The Miami Herald through several means, including a) delivery to home subscribers, b) sales through dealers (e.g., convenience stores), c) vending machine sales, and d) sales to motorists and pedestrians by street "hawkers." 7) Herald Publishing agrees with its advertisers to use its best efforts to maintain the largest *382 circulation possible for the newspapers in which the advertisers place their ads. The stipulation is replete with evidence that the advertising facet of Herald Publishing's newspaper business is a key element of the business. Accordingly, we find competent substantial evidence supporting the JCC's specific finding:
[The Miami Herald], pursuant to the contract it enters into with its advertisers, has a primary obligation under said contract to "publish" the advertisers['] ads. To publish means to circulate and [The Miami Herald] has undertaken the obligation to circulate and distribute the ads in its newspapers through all the various means and methods of circulation available, specifically including Hawker Distributors.
Because of the circumstances of the Claimants' injuries, our focus is on Herald Publishing's agreements with a number of "hawker distributors" to augment the circulation of its newspapers. The obligation passed on by the newspaper to its distributors arises in part from its contractual duty to the advertisers to use its best efforts to publish, deliver, and sell newspapers with those ads. Effective November 27, 1989, Herald Publishing executed an "Independent Dealer Agreement" with Manuel Lobarinas for newspaper distribution in southeastern Broward County. In turn, Lobarinas hired a number of street hawkers, including Claimants, to sell ("hawk") The Miami Herald on street corners. On February 27, 1990, while hawking the newspaper at an intersection in Hallandale, Ralph Hatch was struck by a police vehicle and sustained injuries. Lobarinas was contractually required by Herald Publishing to carry a workers' compensation policy, but Lobarinas' policy had lapsed at the time of Ralph Hatch's work-related accident, so that no coverage was available for him under said policy. On February 11, 1991, while hawking The Miami Herald, Charlotte Hatch was injured when she tripped over an angle wire. Lobarinas had no workers' compensation coverage on the date of Charlotte Hatch's accident. Claimants filed claims for benefits, alleging Herald Publishing was their statutory employer and, therefore, was responsible for payment of compensation benefits because Lobarinas had no workers' compensation coverage. The claims made other demands, including payment of costs, attorney's fees, and present and future medical benefits. Herald Publishing filed a notice of denial, maintaining that it did not employ Claimants nor was it their statutory employer.
The sole issue presented on appeal is whether the JCC correctly found Herald Publishing to be Claimants' statutory employer. Our inquiry begins with section 440.10, the 1989 and 1991 versions of which cover the accidents of Ralph Hatch and Charlotte Hatch, respectively. Aside from an insignificant division of the statute in 1991 into subsections (1)(a) and (1)(b), the pertinent language is exactly the same in both versions. Section 440.10, Florida Statutes (1991), provides in pertinent part:
(1)(a) Every employer coming within the provisions of this chapter, ... shall be liable for, and shall secure, the payment to his employees, or any physician, surgeon, or pharmacist providing services under [certain enumerated provisions].
* * * * * *
(b) In case a contractor sublets any part or parts of his contract work to a subcontractor or subcontractors, all of the employees of such contractor and subcontractor or subcontractors engaged on such contract work shall be deemed to be employed in one and the same business or establishment; and the contractor shall be liable for, and shall secure, the payment of compensation for all such employees, except to employees of a subcontractor who has secured such payment.
The first question is whether Herald Publishing is a "contractor" within the meaning of subsection (1)(b). "To be a contractor under this statute, one must have a contractual obligation to perform some work for another." Acme Oil v. Vasatka, 465 So.2d 1314, 1317 (Fla. 1st DCA 1985). See Motchkavitz, 407 So.2d at 914; Woods v. Carpet Restorations, Inc., 611 So.2d 1303 (Fla. 4th DCA 1992) (condominium *383 association's management and maintenance obligation was "purely statutory" and not contractual, so that its contract with a property management company to perform certain of those statutory duties did not make the condominium association a statutory employer of the management company's employee injured while vacuuming the premises). We find competent substantial evidence supports the JCC's finding Herald Publishing entered into numerous contractual agreements with retail, classified, and national advertisers, pursuant to which the newspaper obligated itself to perform certain services as described previously. The parties' stipulation demonstrates to us a proper basis on which the JCC found those advertising contracts are the source of the contractual obligation at issue here.
In Roberts, 538 So.2d at 57, we held that to be regarded as a "contractor" under the statutory employer provisions of section 440.10(1), "the company's primary obligation in performing a job or providing a service must arise out of a contract." (Emphasis in original.) See Southern Sanitation v. Debrosse, 463 So.2d 420, 422 (Fla. 1st DCA 1985); National Union Fire Insur. Co. v. Underwood, 502 So.2d 1325 (Fla. 4th DCA 1987). Furthermore, the "primary obligation" refers to an obligation under the prime contract between the contractor and a third party, not to any agreement between the contractor and subcontractor. See Sheedy v. Vista Properties, Inc., 410 So.2d 561, 563 (Fla. 4th DCA), rev. den., 419 So.2d 1201 (Fla. 1982); Barrow v. Shel Prods., Inc., 466 So.2d 281 (Fla. 1st DCA 1985); Hammel v. Pittman, 389 So.2d 1220, 1221 (Fla. 1st DCA 1980); Street v. Safway Steel Scaffold Co., 148 So.2d 38 (Fla. 1st DCA 1962). An entity working solely for itself, rather than performing contract work for another, does not meet the criteria for statutory employer. See Cadillac Fairview of Florida, Inc. v. Cespedes, 468 So.2d 417, 419-20 (Fla. 3d DCA 1985) (jury's determination of accident site was significant to resolution of "statutory employer" issue, where developer engaged subcontractor in home construction projects on which subcontractor's carpenter was injured, and one construction site was on the home purchaser's lot, and the other site was on the development company's own lot with no prospective purchaser); Moreno v. Universal Trusses, Inc., 416 So.2d 1221 (Fla. 3d DCA 1982). In reviewing the deputy commissioner's finding in Barrow of no statutory employment based in part on the unwritten nature of the arrangement, we noted that "absence of a written contract is immaterial because the statute does not require that the contract be written," and we reversed the order. 466 So.2d at 282.
The record demonstrates that advertising accounts for more than three quarters of Herald Publishing's consolidated newspaper revenues. The obligation undertaken by the newspaper to its advertisers arises from its numerous advertising contracts. In their stipulation, the parties recognized the importance of Herald Publishing's responsibilities to its advertisers, as the following language illustrates:
12. Total newspaper circulation, the penetration of the market by the newspaper, and the delivery of the newspaper and related advertising products are significant to advertisers and the sale of advertising. If a newspaper and the related advertisement are not delivered to the readers of The Miami Herald, then MHPC as the publisher of the advertisements will not have performed for the advertisers a service which they expected and for which they paid. By purchasing space in the newspaper, advertisers, in effect, are paying for, among other things, the publication and delivery of their commercial messages to the recipients and it is MHPC that provides that service. If total circulation or market penetration decreases, for example, many advertisers would argue that the value of advertisements in The Miami Herald had similarly decreased and thus would request concessions in advertising prices or other terms. The circulation and delivery of newspapers is, therefore, essential to the sale of advertising.
We have carefully reviewed the record and conclude that the JCC correctly determined *384 that, by virtue of its contractual agreements, Herald Publishing has incurred a primary obligation to publish its advertisers' ads. Thus, Herald Publishing meets the statutory classification of "contractor."
Having determined the Employer is a statutory contractor, we next must ascertain whether Herald Publishing "has passed on to another an obligation under the contract for which the person so subletting is primarily obligated," as contemplated in section 440.10(1)(b). Acme Oil, 465 So.2d at 1317; Street. The Supreme Court of Florida has described the effect of subletting as follows:
To "sublet" means to "underlet," Webster's New International Dictionary; in the context in which it is here used, the effect of subletting is to pass on to another an obligation under a contract for which the person so "subletting" is primarily obligated.
Jones, 72 So.2d at 289. In the case at bar, addressing the question of whether Herald Publishing sublet a part of its contractual obligation, the JCC stated:
The Miami Herald Publishing Company has chosen to sublet or pass on its obligation to publish, i.e., circulate, distribute and deliver, their newspapers containing the advertisements to various independent contractors including Delivery Agents (those who deliver papers to home subscribers), Contracted Distributors and Hawker Distributors.
There is competent substantial evidence to support the finding that Herald Publishing sublet or passed along, to its hawker distributors such as Lobarinas, part of its work in satisfaction of the newspaper's primary obligation to a third party under its advertising contracts. See Motchkavitz, 407 So.2d at 912. In turn, the subcontractor (Lobarinas) hired his own employees, including Claimants, who were "engaged on such contract work" in their capacity as hawker sellers. Southern Sanitation, 463 So.2d at 420 (affirming finding that garbage disposal company was contractually obligated to provide services for municipalities, and was statutory employer, where injured claimant worked for uninsured company engaged to haul dirt and cover garbage); Hart v. National Airlines, Inc., 217 So.2d 900 (Fla. 3d DCA 1969) (affirming statutory employer status of airline with federal contract to carry mail, where airline's obligation to load and unload mail was sublet to dispatch service whose employee was injured).
The E/C urged the JCC to construe section 440.10(1)(b) so as to concentrate on the individual specific means of fulfilling the contractual obligation, rather than on the general obligation itself. The E/C cited evidence indicating the percentage of newspaper sales attributable to street hawkers is slight compared to sales through other means of distribution such as subscribed home delivery. From that perspective, publishing and distributing The Miami Herald through street hawkers like Claimants would not constitute a primary obligation under a contractual agreement with advertisers because a substantial portion of the total obligation is fulfilled by several other methods of distribution.
The JCC considered and rejected the E/C's construction of the statute. First, section 440.10(1)(b) contemplates those situations where "any part or parts" of a contractor's work are sublet to one or more subcontractors. In Motchkavitz, the supreme court said "[t]he effect of section 440.10 is that where a subcontractor performing part of the work of a contractor fails to secure payment of compensation, the contractor is liable for same." 407 So.2d at 912. (Emphasis added.) In accordance with our approach in Roberts, we have read section 440.10 in pari materia with the entire workers' compensation act and conclude:
The purpose of section 440.10 is to insure that a particular industry will be financially responsible for injuries to those employees working in it, even though the prime contractor employs an independent contractor to perform part or all of its contractual undertaking... . [T]he obvious legislative intent [is] to insure that a person performing a contractor's work, even as an employee of a subcontractor, *385 shall be entitled to workers' compensation protection with the primary employer if the subcontractor fails to provide such coverage.
538 So.2d at 60. The interpretation of section 440.10(1)(b) argued by the E/C is contrary both to the compelling public policy underlying the statute and to our understanding of the decisional law construing the statutory employer doctrine. See, e.g., Belford Trucking Co. v. Pinson, 360 So.2d 1140 (Fla. 1st DCA 1978); Larson, 1C Larson's Workmen's Compensation Law § 49.15 (1993).
The E/C maintain the case sub judice is controlled by Jenkins v. Peddie, 145 So.2d 729 (Fla. 1962), in which the supreme court rejected a claim that Peddie's taxicab company (Victory Cabs), which had licensed other taxicab entrepreneurs (including Goodson) to operate additional taxicabs from Victory Cabs' taxicab stand, was the statutory employer of Goodson's injured employee, a taxicab driver (Jenkins). The contract at issue was between Victory Cabs and the City of Tallahassee and involved a franchise agreement pursuant to which Victory Cabs was permitted to operate a taxicab stand. The authorizing municipal ordinance required Peddie to operate a minimum of five taxicabs, and he chose to operate six of his own taxicabs. Peddie arranged for several other independent individuals, including Goodson (who had four taxicabs), to use the Victory Cabs name, taxicab stand, and dispatch service for a flat fee. Goodson had employed Jenkins to drive one of Goodson's taxicabs, in which vehicle Jenkins was shot and killed by a passenger. Id. at 730. The claimant's widow appealed an order finding Goodson, and not Peddie and Victory Cabs, was the claimant's employer. The supreme court declined to disturb the order, holding no contractor-subcontractor relationship was created between Peddie and Goodson: 1) Peddie's own taxicabs fulfilled Victory Cabs' contractual obligation to the City, and 2) Peddie's agreements with other entrepreneurs like Goodson to operate through his stand and under the company name involved an "optional privilege under his franchise" rather than the execution of Peddie's primary contractual obligation to the City. Thus, Peddie did not pass along any obligation to Goodson or the others. Id. at 731. We agree with Claimants that Jenkins is factually distinguishable and not controlling.
The record supports the finding that Herald Publishing occupied the status of "contractor" pursuant to the aforementioned contracts with its advertisers, that Herald Publishing sublet part of its contract work, i.e., its primary obligation to publish and distribute newspapers with ads, to subcontractors, one of whom engaged Claimants to work. Lobarinas had no workers' compensation coverage at the time of Claimants' injuries. We find this is the very type of situation to which the statutory employer doctrine was intended to apply. Roberts. Accordingly, we AFFIRM.
BOOTH and KAHN, JJ., concur.